IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KARIN WOODRUFF                                                    PLAINTIFF

        v.                    Civil No. 11-5089

KATHY O'KELLY; CHAD WILSON;
OVERTON MEYER-HESLER; and
CITY OF SPRINGDALE, ARKANSAS                                      DEFENDANTS

MEMORANDUM OPINION

Now on this 9th day of July, 2012, comes on for consideration **Defendants' Motion for Summary Judgment** (document #28), and from said motion, response, and reply thereto, the Court finds and orders as follows:

1.   This case arises from a traffic stop during which plaintiff Karin Woodruff was arrested for driving while intoxicated. Ms. Woodruff brings this action against defendants in their individual and official capacities, pursuant to 42 U.S.C. § 1983, asserting that defendants violated her rights under the Fourth, Eighth,[1] and Fourteenth Amendments. Specifically, she claims

        (a) that defendants violated her Fourth Amendment rights by arresting her without probable cause; by failing to transport

---

[1] The Eighth Amendment is not implicated here because Ms. Woodruff was not a convicted prisoner at any time relevant to the complaint. However, because the Fourteenth Amendment affords pre-trial detainees at least as much protection as the Eighth Amendment affords to convicted prisoners, the Eighth Amendment's deliberate-indifference standard applies to Ms. Woodruff's claims. *See Grayson v. Ross*, 454 F.3d 802, 808 (8th Cir. 2006).

her to a hospital for medical treatment when they knew or should have known that medical treatment was necessary; and by denying her a phone call to seek help;

(b) that defendants were deliberately indifferent to and deliberately deprived her of her right to receive medical attention for her serious medical condition while she was in defendants' custody;

(c) that Chief Kathy O'Kelly improperly trained and supervised Officers Wilson and Meyer-Hesler and failed to investigate the incident after it occurred; and

(d) that the City of Springdale is vicariously liable for the acts of the other defendants.

### BACKGROUND

2.   These are the undisputed material facts.

*   Ms. Woodruff underwent surgery on November 9, 2009, to remove a brain tumor.

*   Following the surgery, Ms. Woodruff spent three days in the hospital before being discharged, after which she felt fine.

*   On November 19, 2009, Ms. Woodruff's surgical staples were removed by her doctor in Tulsa, Oklahoma.

*   On or about November 20, 2009, having been cleared for travel by her doctor, Ms. Woodruff drove from Oklahoma to Springdale, Arkansas, to visit her stepdaughter and grandchildren. She felt well and even stayed the night at a casino and gambled

-2-

before arriving in Springdale.

     *   On November 21, 2009, the morning after she arrived in Springdale, Ms. Woodruff drove herself to the emergency room with complaints of a headache. She had taken the narcotic painkiller hydrocodone the night before.

     *   The hospital performed a CT scan and gave Ms. Woodruff a morphine drip. Dr. Linda McGhee, the emergency-room doctor who treated Ms. Woodruff, could not conclusively determine whether Ms. Woodruff was experiencing any brain swelling.

     *   Dr. McGhee gave Ms. Woodruff an initial dose of steroids as a precautionary measure and prescribed further steroids as a "tapering" dose. Additionally, Dr. McGhee prescribed the narcotic painkiller Percocet.

     *   Ms. Woodruff was released from the emergency room around noon on November 21, 2009, but she did not fill her prescriptions at that time. Ms. Woodruff was advised not to drive for ten hours.

     *   At 11:00 p.m. on November 21, 2009, Ms. Woodruff attempted to drive herself to Walgreen's Pharmacy to fill the prescription for Percocet. She had not done so earlier because she had forgotten about it and felt fine throughout the day.

     *   Ms. Woodruff claims that, while driving to Walgreen's, she got lost.

     *   At that time, Ms. Woodruff was stopped by a sheriff's deputy near Prairie Grove, Arkansas. She did not know how she had

gotten there and did not remember getting on the interstate. The deputy issued her a warning for careless driving.

*   Two hours later, Officer Chad Wilson stopped Ms. Woodruff's vehicle. Officer Wilson told Ms. Woodruff that he stopped her because she had crossed left of center at least three times.

*   At this point, despite having a global positioning system in her car, Ms. Woodruff was on the opposite side of Springdale heading in the opposite direction of where she stated she intended to go.

*   Officer Wilson noted that Ms. Woodruff's purse contained bottles of pills later identified as hydrocodone, oxycodone, and alprazolam.

*   During the stop, Officer Wilson performed the horizontal gaze nystagmus field-sobriety test, through which Ms. Woodruff exhibited no clues of intoxication.

*   Nor did Ms. Woodruff exhibit any signs of a head injury. The Springdale Police Department trains its officers that head injuries, including strokes, may "create disorientation, confusion, lack of coordination, slowed responses, speech impairment, and other gross indicators of alcohol or drug influence." In the case of head injuries or strokes, officers are trained that,

> [b]ecause the injury usually affects one side of the brain more than the other, disparities usually will be

> evident in the subject's eyes. Look at the pupils, and
> observe whether they are obviously different in size.
> Check the eyes' tracking ability, and see whether they
> are dissimilar, e.g., one eye moving smoothly while the
> other jerks noticeably. Check the eyelids to see if one
> droops while the other appears normal.

Here, Ms. Woodruff's pupils were the same size, her eyes had equal tracking, and they were not dissimilar. Neither of her eyelids drooped, and both appeared normal.

　　　*　　Next, Officer Wilson administered the "walk and turn" field-sobriety test. Ms. Woodruff failed this test, exhibiting six out of eight possible clues.

　　　*　　Finally, Officer Wilson administered the "one-leg stand" test, which Ms. Woodruff also failed. She exhibited three out of four possible clues.

　　　*　　Officer Wilson placed Ms. Woodruff under arrest and took her to the Springdale Police Department.

　　　*　　Upon arrival at the police department, Officer Wilson administered a blood-alcohol breath test. Ms. Woodruff registered 0.00%.

　　　*　　Officer Overton Meyer-Hesler, a certified drug-recognition expert, conducted a drug-influence evaluation of Ms. Woodruff, after which he concluded that she was under the influence of a narcotic drug.

　　　*　　Officer Meyer-Hesler noted, as had Officer Wilson, Ms. Woodruff's statement that she had gone to the hospital earlier for brain swelling and that she had a tumor removed two weeks prior.

\* Officer Meyer-Hesler also noted no[2] abnormal conditions in Ms. Woodruff's eyes, such as obviously different pupils, dissimilar tracking ability of the eyes, one eye moving smoothly while the other jerks noticeably, or drooping eyelids.

\* Following the drug-influence evaluation, Officer Wilson transported Ms. Woodruff to the Northwest Medical Center in Springdale to collect blood and urine samples for further analysis.

\* A nurse observed Ms. Woodruff throughout the process of collecting the urine sample. Ms. Woodruff did not advise the nurse that she needed any medical assistance.

\* During the collection of the blood sample, both Officer Wilson and the phlebotomist observed Ms. Woodruff. She did not advise the phlebotomist that she needed any medical attention, nor did anyone at the hospital advise Officer Wilson that Ms. Woodruff was in need of medical care.

\* Officer Wilson then transported Ms. Woodruff back to the Springdale Police Department, where she was held in the booking area while completing the booking process.

\* Ms. Woodruff was released on her own recognizance at 7:20 a.m. on November 22, 2009.

---

[2]Although Defendants' Statement of Undisputed Material Facts (document #30) states that Officer Meyer-Hesler "noted abnormalities in [Ms. Woodruff's] eyes," this appears to have been a typographical error. The supporting documentation, as well as defendants' brief (document #29), indicate that the officer did not note any abnormalities in Ms. Woodruff's eyes. Defendants note the error in their reply brief (document #35).

3.    Despite the numerous agreed facts in this case, almost all of what occurred immediately before and after the arrest is in dispute. Ms. Woodruff claims to have informed the officers repeatedly that she needed medical attention for swelling on her brain and to have pleaded with them for medical treatment. She also claims to have received medical treatment after her release from jail (although she offers no diagnosis of brain swelling). Further, she claims to have been diagnosed with emotional trauma as a result of the incident. Defendants deny these allegations.

**AUTHENTICATION OF SUPPORTING DOCUMENTS**

4.    As an initial matter, Ms. Woodruff challenges the authentication of several of defendants' supporting documents, including the officers' dash-cam videos, the arrest report, and portions of the Springdale Police Department's policy and procedures manual. The basis of her challenge is that these documents are not sworn statements and are not authenticated by affidavits. Therefore, she argues, those documents should not be considered at the summary-judgment stage. In making this argument, Ms. Woodruff relies on an outdated version of Federal Rule of Civil Procedure 56 and case law stemming from that version. Rule 56 was amended in 2010 and no longer requires sworn statements for the purposes of authentication. Under the current rule, a party seeking summary judgment must support its assertions by

(a) citing to particular parts of materials in the record, or

(b) by showing that the materials cited do not establish a genuine dispute or that the adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1) (2012).

5.   The documents offered by defendants to support their assertions were produced and discussed during the discovery process and were attached as exhibits to the motion for summary judgment. Thus, the documents are properly in the record and may be considered with this motion. Even so, defendants have submitted authenticating affidavits for the disputed documents with their reply brief (document #35).

## DISCUSSION

6.   The individual defendants argue that they are entitled to summary judgment based on the undisputed facts and the doctrine of qualified immunity. Qualified immunity protects government officials, such as police officers, from individual liability under § 1983, unless their conduct violated clearly established constitutional rights of which a reasonable person would have known. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 473-74 (8th Cir. 2010). To overcome a claim of qualified immunity, a plaintiff must show that

(a) the facts asserted by the plaintiff demonstrate that

the defendants deprived the plaintiff of a constitutional right; and

       (b) the right was clearly established at the time of the deprivation.

*Id.* at 474. When considering the issue of qualified immunity at the summary judgment stage, the Court must view the facts in the light most favorable to the party opposing summary judgment. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). However, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, the Court is not required to adopt that version of the facts for purposes of summary judgment. *Id.* at 380.

    7.   Ms. Woodruff's claims can be categorized into two primary issues: whether there was sufficient probable cause for her arrest and whether, after her arrest, the officers were deliberately indifferent to her serious medical need. Her claims against Chief O'Kelly and the City of Springdale are secondary and turn on whether there was a custom or policy of overlooking constitutional violations such as those alleged in this case. The Court will address each claim and each party in turn. *See Handt v. Lynch*, No. 11-1829, slip op. at 5, 8 (8th Cir. June 14, 2012).

### *Officer Chad Wilson*

    8.   Under the first step of the qualified-immunity analysis, the Court must determine whether Officer Wilson violated Ms.

-9-

Woodruff's constitutional rights.

(a) Ms. Woodruff first alleges that Officer Wilson lacked probable cause for her arrest. The Fourth Amendment, as applied to the States through the Fourteenth Amendment, requires that an officer have probable cause before making a warrantless arrest. *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). Probable cause exists when the totality of circumstances is such that a prudent person would believe the arrestee had committed a crime. *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). However, an officer contemplating arrest cannot disregard plainly exculpatory evidence. *Id.*

Ms. Woodruff claims that she told Officer Wilson her brain was swelling and that this information should have excused any law she may have broken, thus precluding her arrest. The Court disagrees. The undisputed facts indicate that Officer Wilson acknowledged Ms. Woodruff's statement about having undergone brain surgery and that he specifically looked for signs of a brain injury while performing the field-sobriety tests. He saw no such signs. Thus, it is clear that Officer Wilson did not disregard plainly exculpatory evidence.

Furthermore, although Ms. Woodruff claims to have practically begged Officer Wilson to take her to a hospital, this is blatantly contradicted by the dash-cam video. In the video, which captured the entire traffic stop and most of the dialogue between Ms.

-10-

Woodruff and the officers, Ms. Woodruff appears somewhat flustered, giggly, and unsteady. But she does not appear to be in great distress, nor does she ask repeatedly for medical treatment. The Court is not required to blindly accept Ms. Woodruff's assertions when they are blatantly contradicted by the record.

Based on these facts, the Court finds that Officer Wilson had sufficient probable cause to arrest Ms. Woodruff. Therefore, the arrest created no Fourth Amendment violation, and Officer Wilson is entitled to qualified immunity on this claim.

(b) Next, the Court will consider whether Officer Wilson violated the Fourteenth Amendment by showing deliberate indifference to a serious medical need after he had placed Ms. Woodruff under arrest. To establish a constitutional violation for the denial of medical treatment, Ms. Woodruff must show that

(1) she suffered from an objectively serious medical need, and

(2) the officer actually knew of but deliberately disregarded that need.

*Williams v. Kelso*, 201 F.3d 1060, 1065 (8th Cir. 2000)*; Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). A "serious medical need" is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Grayson v. Ross*, 454 F.3d 802, 809 (8th Cir. 2006). A plaintiff's self-

-11-

diagnosis alone cannot establish a serious medical need. *See Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994).

The facts in this case, even viewed in the light most favorable to Ms. Woodruff, do not show that Ms. Woodruff suffered from an objectively serious medical need on the night of her arrest. The only medical evidence offered was inconclusive as to whether Ms. Woodruff had any brain swelling. In fact, Ms. Woodruff was released from the emergency room the morning before her arrest and admittedly felt fine throughout the rest of the day. Although she claims to have experienced headaches and disorientation later that night, Ms. Woodruff has offered no evidence that this was caused by brain swelling. Nor has she offered any evidence of a medical diagnosis of brain swelling following her release from jail the next morning.

Moreover, Ms. Woodruff did not display any signs of a medical need that a lay person would easily recognize. The size of her pupils were not dissimilar, neither side of her face drooped any more than the other, she had no obvious bleeding or wounds, and she was able to competently communicate with the officers. Indeed, the deposition testimony indicates that even a physician would have been unable to determine a medical need based on Ms. Woodruff's appearance and behavior that night.

Without any evidence——other than her self-diagnosis——to support her assertions, Ms. Woodruff has not shown that she

suffered from an objectively serious medical need. Thus, she has not established that Officer Wilson violated a constitutional right. Officer Wilson is entitled to qualified immunity on this claim, as well.

Because Ms. Woodruff has failed to show that Officer Wilson deprived her of any constitutional right, the Court need not proceed to the second step of the analysis. Officer Wilson is entitled to qualified immunity from Ms. Woodruff's suit.

### *Officer Overton Meyer-Hesler*

9.   The Court will employ the same analysis to the claims against Officer Meyer-Hesler, first with regard to the claim of arrest without probable cause. This claim must fail as to Officer Meyer-Hesler because, although he was present prior to and during the arrest, the evidence is undisputed that it was Officer Wilson, not Officer Meyer-Hesler, who actually placed Ms. Woodruff under arrest.

With regard to the deliberate indifference claim against Officer Meyer-Hesler, the claim fails for the same reason discussed above in reference to Officer Wilson. Officer Meyer-Hesler performed his own evaluation of Ms. Woodruff and found no signs that she had suffered a brain injury. Moreover, Ms. Woodruff's self-diagnosis is not enough to establish a serious medical need. Taking the facts as Ms. Woodruff has presented them, the Court finds insufficient evidence that she suffered from an

-13-

objectively serious medical need, i.e., brain swelling, on the night of her arrest.

As with Officer Wilson, the Court finds no need to proceed to the second step of the qualified-immunity analysis. Ms. Woodruff has failed to show that Officer Meyer-Hesler deprived her of a constitutional right; thus, he is entitled to qualified immunity on all claims.

### Chief Kathy O'Kelly

10.  The Court now turns to the claims against Chief O'Kelly in her individual capacity. Ms. Woodruff accuses Chief O'Kelly of failing to properly train and supervise the officers under her command and of failing to properly investigate the incident that led to this suit. Chief O'Kelly asserts qualified immunity.

(a) The Court must first determine whether Chief O'Kelly has violated a constitutional right. Government officials may not be held responsible for the unconstitutional conduct of their employees under a theory of respondeat superior. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). A plaintiff naming such an official as a defendant must show that the official has violated the Constitution through her own individual actions. *Id.* If alleging that the official failed to properly train or supervise her employees, the plaintiff must show that the official was deliberately indifferent to or tacitly authorized the offending acts. *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996). The

-14-

plaintiff must show that the official had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation. *Id.*

Ms. Woodruff attempts to circumvent vicarious liability by claiming that Chief O'Kelly personally violated her rights by not properly training and supervising the officers. Yet she has offered no proof of such violations beyond mere assertions. Ms. Woodruff argues that these officers' alleged failure to follow certain policies and procedures during her arrest could only be a result of a lack of training. The Court rejects this argument since, as noted above, the Court has concluded that the officers in question did not act with deliberate indifference or otherwise inappropriately.  Even if the Court had not so concluded, her logic is flawed since——even if the allegations are true——a single incident is not indicative of an overall lack of training and would not support the claim against Chief O'Kelly.

The Court further notes that, even if it were to be assumed that the allegations are true,  nothing shown here would rule out other factors that might have led to the violations. Thus, without more, the notion that poor training was the sole (or even a contributing) cause of the incident would be nothing more than mere speculation.

Accordingly, Ms. Woodruff's claim that Chief O'Kelly failed to properly train or supervise the officers must fail.

-15-

(b) Ms. Woodruff also asserts a claim against Chief O'Kelly for her alleged failure to investigate the incident in question. With regard to such an allegation, the official may be subject to individual liability under § 1983 if

(1) the official had notice of a pattern of unconstitutional acts committed by employees;

(2) the official demonstrated a deliberate indifference to or tacit authorization of the offensive acts;

(3) the official failed to take sufficient remedial action; and

(4) the failure to investigate proximately caused injury.

*Id.*

There is no proof in the record that Chief O'Kelly ignored a pattern of unconstitutional acts on the part of her subordinates. Even if it could be shown that Chief O'Kelly ignored violations in this particular incident (a matter very much in dispute), such a showing would not be sufficient to demonstrate a constitutional violation under the foregoing criteria.

Viewing the evidence in the light most favorable to Ms. Woodruff, as the Court is required to do, the Court concludes that Ms. Woodruff has failed to demonstrate a constitutional violation by Chief O'Kelly. Because no violation has been established, it is unnecessary to proceed to the second step of the analysis. Chief

O'Kelly is entitled to qualified immunity.

### *City of Springdale*

11.   Finally, the Court will consider the claims against the City of Springdale and the other defendants in their official capacities. Ms. Woodruff claims that officers for the City of Springdale, while acting in their official capacities, routinely and customarily commit constitutional violations such as the ones alleged in this action. Therefore, she argues, the City itself is responsible for the officers' actions.

A suit against a governmental employee in his official capacity is treated the same as a suit against the local government itself. *Dornheim v. Sholes,* 430 F.3d 919, 926 (8th Cir.2005). A local government may not be sued under § 1983 on the theory of respondeat superior. *Lansdown v. Chadwick*, 152 F. Supp. 2d 1128, 1146 (W.D. Ark. 2000) *aff'd,* 258 F.3d 754 (8th Cir. 2001). However, the entity may be liable under § 1983 when its official policy, statement, or decision can be causally related to the allegedly unconstitutional conduct of its employees. *Id.* A custom or pattern of constitutional violations can also create the basis for liability, even if such custom has not received official approval. *Id.*

Ms. Woodruff has presented no evidence——beyond her mere accusations——that any Springdale officer has exhibited a pattern of constitutional violations. Nor has she shown that the City has

-17-

any custom or policy of permitting such violations. Without evidence to support these claims, summary judgment is proper. The Court, therefore, finds that summary judgment should be granted as to the City of Springdale and the other defendants in their official capacities.

**IT IS THEREFORE ORDERED** that **Defendants' Motion for Summary Judgment** (document #28) is **granted** as to each individual defendant based on qualified immunity.

**IT IS FURTHER ORDERED** that summary judgment is **granted** as to the City of Springdale and each defendant in their official capacities. This matter will be dismissed by a separate order.

**IT IS SO ORDERED.**

                                    **/s/ Jimm Larry Hendren**
                                    **JIMM LARRY HENDREN**
                                    **UNITED STATES DISTRICT JUDGE**

-18-